No. 2797

Second Circuit

## MAYS v. ALLISON & LANGSTON SUPPLY CO.

(Jan. 28, 1927.  Opinion and Decree.
(Feb. 24, 1927.  Rehearing Refused.)

*(Syllabus by the Court)*

1. **Louisiana Digest—Master and Servant —Par. 159, 160 (j).**

Under the Workmen's Compensation Law, prior to the amendment by Act 85 of 1926, where an employee was suing for compensation for disability resulting from a broken ankle and the evidence failed to show total disability at the time of the trial and the employee was able to walk without the aid of crutches and the preponderance of the evidence as to the condition of his ankle showed that there was no deformity, that he had good use of the ankle in all directions of motion in standing on it and in walking, that the broken fragments were in perfect alignment, good apposition and good union, and that the employee would be entirely recovered from his injury in from six to eight weeks, the court should fix a definite period during which compensation should be paid.
Rogers vs. Thermatomic Carbon Co., 157 La. 193, 102 South. 304.
Upshaw vs. Triangle Drilling Co., 5 La. App. (    ).

2. **Louisiana Digest—Master and Servant —Par. 160 (e), 160 (k).**

An injured employee has no standing to sue for compensation under the Workmen's Compensation Law until a dispute exists between him and his employer as to his right to compensation or the amount he is entitled to receive; but where the employee sues in the absence of such dispute and the employer answers denying his right to

compensation, the petition and answer constitute a dispute, and the plaintiff, if successful in the action, can only be cast for the costs incurred up to the filing of the answer.

3. **Louisiana Digest—Master and Servant —Par. 160 (i), 160 (k); Costs and Fees—Par. 37.**

Article 442 of the Code of Practice provides the manner in which experts may be appointed, and if neither party to the suit objected to the examination of the experts on trial of the case, it is too late to object to a reasonable fee for their testimony after the case has been tried.

Walker vs. White Woods Products Co., 4 La. App. 403.

(The recent amendment to Act 20 of 1914 is Act 85 of 1926. Editor's note.)

Appeal from the Eighth Judicial District Court of Louisiana, Parish of LaSalle. Hon. F. E. Jones, Judge.

Action by Charles F. Mays against Allison & Langston Supply Company.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

Long & McSween, of Shreveport, attorneys for plaintiff, appellee.

Thornton, Gist & Richey, of Alexandria, attorneys for defendant, appellant.

## STATEMENT OF THE CASE.

REYNOLDS, J.    Plaintiff sues defendant under the Workmen's Compensation Law, for $20.00 a week for 400 weeks beginning March 4, 1926, for disability resulting from a broken ankle.

Defendant admitted the existence of the injury but denied plaintiff's right to sue, alleging that at the time the suit was brought no dispute existed between him and it and that up to that time it had paid him all compensation he claimed he was entitled to and had not denied its liability and was willing to continue paying him compensation until he was able to resume work; and it prayed that if at the time of trial he should still be disabled that he be awarded compensation only until that date and that if he be then no longer disabled that he be denied further compensation, and that in any event plaintiff be cast for the costs of the suit.

On these issues the case was tried and judgment was rendered in favor of the plaintiff for $20.00 a week for forty weeks, beginning March 4, 1926, with reservation of his right to reopen the case at the end of that time, and taxing the defendant with all costs, including the fees of two medical experts which were fixed at $15.00 each.

Both plaintiff and defendant appealed.

## OPINION

Defendant contends that at the time of the trial the broken bones of plaintiff's ankle had entirely healed and that he would be able to resume work in from six to eight weeks from that time.

The first question to be decided, therefore, is whether or not the evidence shows that plaintiff would be able to resume work in from six to eight weeks as contended by defendant.

Doctor C. L. Wolf, the surgeon who treated plaintiff's ankle, testified, page 52:

"What was the nature of his injury, doctor?

"A. He had a fracture of the internal malleolus of the right ankle, extending obliquely from inwardly up and outwardly; a transverse fracture of the external malleolus.

"Q. Did he respond to the treatment you gave him?

"A. Yes, sir.

\* \* \*

"Q. How long should it have been from the time that you last examined him until he should have been able to resume his usual occupation?

"A. About forty to sixty days.

"Q. In your opinion, then, for all practical purposes, he would have had the full function in all probability from forty to sixty days? From the time you examined him, May 1st?

"A. Yes, sir, with the probability that there would be some swelling on excessive exercise; as sometimes in a fracture of the leg there is usually some swelling on being used, for a space of six months to a year.

"Q. But for all practical purposes he should have full function of the member?

"A. Yes, sir.

"Q. And full use of it?

"A. Yes, sir.

"Q. Doctor, were there any complications in this case?

"A. No, sir.

"Q. Was his recovery all that you could expect during the time that you treated him?

"A. Yes, sir.

\* \* \*

"Q. Doctor, had there been a union of both bones at the point of the fracture at the time that you made these pictures?

"A. Yes, sir.

"Q. That shows bony union of both bones at the fracture?

"A. Yes, sir.

"Q. Did you make a physical examination to ascertain whether or not there was any mobility of the fractured fragments?

"A. Yes, sir; the day that I made the last picture.

"Q. Did you find any mobility?

"A. No, sir.

\* \* \*

"Q. There is bony union of both of the fractures?

"A. Yes, sir.

"Q. Doctor, what about the alignment? Is that good or bad.

"A. It is good.

"Q. The alignment of the foot?

"A. It is good.

\* \* \*

"Q. Doctor \* \* \* I will ask you whether or not there was bony union after two and a half months?

"A. As far as I could tell from the x-ray and from an examination, there was bony union.

"Q. Does the examination of the x-ray plate made by Dr. M. L. Adair, that has been handed to you, change your opinion of that at the present time?

"A. It does not.

"Q. Does that confirm it?

"A. Yes, sir.

"Q. That picture shows bony union of both fractures?

"A. Yes, sir, as far as I can tell from the x-ray there is bony union.

"Q. Doctor, if on the 25th day of May an ordinary layman could see that the bone was movable by putting his hand on it on the outside, would that change your opinion?

"A. No; I examined it and it did not move at the time of my examination. I examined him very carefully the day that I took that x-ray with that thing in view, as he was complaining of it, and I made the motions in every direction and I could not get the bone to move at all.

\* \* \*

"Q. You made a thorough examination and could find no mobility?

"A. I could not.

"Q. And taking the x-ray pictures, you found no evidence of that or of non-union?

"A. No, sir, I did not.

"Q. Did you find that there was bony union?

"A. I did."

Doctor J. I. Peters testified, pages 71 and 72:

"Q. What did you find the condition of his ankle to be in at the time you made the examination?

"A. I found his ankle in good condition; particularly I found that he claimed fracture of the right ankle. There was no evidence of any deformity; he had good use of the ankle in all directions of motion, in standing on it and in walking. The x-ray picture showed, first, a fracture of the malleoli; the fragments were

in perfect alignment, good apposition and good union. There was a slight difference in the size of the two ankles, such as you always find, practically always find, following a fracture. There was nothing else that we found of any particular significance. He claimed, however, walking on his ankle caused it to tire easily and after hours of standing became sore.

\* \* \*

"Q. About what length of time, from the time that you examined him, in your opinion, will he be able to resume his ordinary labor and do a full amount of manual labor on that foot?

"A. I would consider a period of six or eight weeks a liberal allowance for time in regaining complete restoration of function.

\* \* \*

"Q. You are also of the opinion that within the next six or eight weeks he will have full use of the member for all practical purposes.

"A. Yes, sir."

Doctor P. K. Rand testified, pages 73 and 74:

"Q. Did you have occasion recently to examine C. F. Mays, the plaintiff in the suit of C. F. Mays vs. Allison & Langston Supply Co., who is supposed to have been injured by having his ankle fractured about the 25th day of February, 1926?

"A. I did, on May 27th.

"Q. What did you find his condition to be at that time, doctor?

"A. I found that he had an old fracture of the right internal and external malleolus; that the bone fragments were in good alignment; that there was fair union; there was no ankolosis of the ankle joint; no limitation of motion, though there is still some tenderness on extreme motion of the foot in any direction.

\* \* \*

"Q. What have you to say as to his ability to use the foot for all practical purposes, and when in your opinion, he will have full function for all practical purposes in doing ordinary or manual labor of a reasonable character?

"A. I think that he will have full return of function of the ankle joint and absolutely firm union of the fractures in six weeks to two months from the date I examined him.

"Q. Is the ankle in as good condition as you could expect, considering the nature of the injury, from the time that has elapsed since the injury?

"A. I think that his ankle is very good; both of the bones are in good alignment; there is no sign of ankolosis or any other disability; and I see no reason why he should not have perfect function."

Doctor R. C. Simmons testified, pages 75 and 76:

"Q. Did you have occasion to examine the ankle and foot of C. F. Mays, the plaintiff in this case, on or about May 27, 1926?

"A. Yes; I remember the case very distinctly.

"Q. Please state what you found the condition of his ankle to be in?

"A. Well, you could hardly tell that he had had an injury to this ankle. All the motions were perfect. He showed slight indentation upon pressure over the region of the external malleolus; but he has what I consider good union though it is not as firm as it will be within the next few weeks. He should have absolutely no disability resulting from this injury.

"Q. Now, within what period of time should he regain full function for all practical purposes?

"A. Within six weeks at the most. I think he ought to be able to do anything within six weeks."

Against this testimony of these four eminent surgeons we have the testimony of Doctor M. L. Adair and Doctor E. L. Sanderson to the effect that there is now non-union of one of the fractures of the ankle joint.

Doctor Adair testified, pages 22, 23, 24:

"Q. How far is the fracture from the ankle joint?

"A. The internal malleolus that we speak of is the knot on the inside of the ankle; and the exterior malleolus is on

the outside. And the fracture extends through those two knobs; the knot on the inside is reunited and the knot on the outside has not united.

* * *

"Q. Doctor, how was the plaintiff getting along about at that time?

"A. He walked in my office and walked out when I got through. I did not see him. I don't think I saw him walking but I had my back turned when he came in and when he left.

"Q. Did he have a cane?

"A. I don't remember any cane. He did not have any crutches.

"Q. Doctor, how long will it take that ankle to get back to its normal position or condition, or as near normal as you expect it to get back, that is, where he can use it for all practical purposes?

"A. The fracture ought to be completely united in six weeks and will be all over in eight weeks from the time of the fracture.

* * *

"Q. Don't you think that he could in a very short time, if not at the present time, take up ordinary manual labor such as driving a truck?

"A. I think that he could drive a truck probably now. It would be just a question of how much pain he has. These fractures that fail to unite are frequently painful, give pain on use. However, if the pain is not great, he should be able to work, but there would be risk of turning that ankle and making the conditions worse."

Doctor E. L. Sanderson testified, pages 29, 30, 33:

"Q. You mean by movement of the joint or bone above the ankle joint on the inside?

"A. Yes. Taken in conjunction with the examination of the x-ray my diagnosis was a fracture of the internal and external malleoli, with union of the external and non-union of the internal. I would not say non-union, but either non-union or fibrous union; and I may be mistaken as to the side of the foot, because I don't recollect definitely which side that had the movable malleolus, but it was on one side. The malleolus apparently was movable.

"Q. How long will it be before he is able to resume ordinary manual labor of a reasonable character?

"A. As soon as this malleolus is united firmly and the callous is absorbed.

"Q. What length of time would you expect that to take?

"A. Well, that is hard to tell, because it should have been united by now.

* * *

"Q. Assuming that this man was a truck driver, delivering oil well supplies, don't you think that he could within a very short time, if not now, be able to resume that occupation?

"A. Well, I think he could, if he had to, probably go to work now, if it was imperative."

Under the above testimony the trial court was of the opinion that plaintiff's ankle would be entirely well in forty weeks dating from the date of the accident. In arriving at this time the court gave plaintiff compensation as for total disability from the date of the accident, February 25, 1926, up to the time of the examination, about May 27, 1926, three months, and, in addition thereto, allowed the eight weeks, testified to by the surgeons as the additional time that would be required for plaintiff to completely recover, making in all, twenty weeks, and then doubled that time in order to make sure that plaintiff would be entirely recovered by the time his compensation ceased.

After carefully reading all the testimony, we cannot say that the trial court erred in fixing the definite period of forty weeks during which plaintiff should receive compensation.

In addition to allowing compensation for forty weeks, the judgment provides—

"* * * that at the end of forty (40) weeks, plaintiff's right to reopen the case is reserved."

We have been unable to find any law authorizing this part of the judgment and defendant's attorneys contend and plaintiff's attorneys concede that it is without warrant in law. Therefore so much of the judgment as reserved to plaintiff the right to reopen the case at the end of forty weeks must be reversed.

Defendant earnestly insists that that part of the judgment that fixes the fee of the expert witnesses at $15.00 each and requires defendant to pay them is contrary to law.

In the case of Walker vs. White Woods Products Co., 4 La. App. 403, the Court of Appeal for the first circuit, in passing on a similar question, said:

"Defendant and appellant earnestly complains of that part of the decree which condemns it to pay two hundred dollars for expert witnesses. Plaintiff called three physicians to the witness stand and defendant called one, all four of whom were examined as to their opinion and were used as experts. They attended court for two days and each was allowed a compensation of twenty-five dollars per day. Defendant argues that plaintiff might in the same manner have summoned and examined an unlimited number of experts, and under the ruling made by the trial judge in this case, these proceedings would have become so expensive that it would have been deprived of its right to contest plaintiff's demand for fear of being cast for an excessive amount of costs. Plaintiff justifies his action by saying that defendant with its plenteous means was in a position to consult and advise with experts of ability and that he, in his very limited financial condiiton, could only offset defendant's advantage in consulting and summoning experts by engaging them as witnesses. Of course neither of these arguments demands any refutation on the part of the court. Arti-

cle 442 of the Code of Practice provides the manner in which experts may be appointed and if either of the parties in this suit had objected to the examination of these experts and called the trial judge's attention to the matter and presented to him the question as they have presented it here, he would have exercised the jurisdiction and discretion vested in him by the cited article of the Code of Practice, and the present complaint by defendant would not have been made. Instead of objection · to this opinion evidence at the time it was elicited, both parties examined these physicians, and took advantage of them · as witnesses. The compensation allowed to them does not appear to us to be excessive and to deprive them of it, after they had earned it, would be a· flagrant injustice."

Under this authority we are of the opinion that the judgment fixing the fee of the expert witnesses at $15.00 each and taxing defendant with them, is correct.

For the above reasons, it is therefore ordered, adjudged and decreed that that part of the jugment appealed from which allows the plaintiff compensation at twenty dollars per week for forty weeks beginning March 4, 1926, is affirmed.

It is further ordered, adjudged and decreed that defendant be allowed credit on this judgment for the compensation already paid by it to plaintiff on account of his injuries.

It is further ordered, adjudged and decreed that plaintiff pay all costs of this suit up to the filing of defendant's answer and all costs of this appeal and that defendant pay all other costs.

It is further ordered, adjudged and decreed that that part of the judgment appealed from which provides "that at the end of forty (40) weeks plaintiff's right to reopen the case is reserved," be annulled, avoided and reversed.

It is further ordered, adjudged and decreed that that part of the judgment fixing the fees of the expert witnesses at fifteen dollars each and taxing defendant with them as costs of suit be affirmed.

It is further ordered, adjudged and decreed that as thus amended the judgment appealed from be affirmed.